UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARTIN A. BADINELLI,

                                            Plaintiff,

     v.

THE TUXEDO CLUB,

                                            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.15-cv-06273

ECF Case

**DECLARATION OF WILLIAM D. FRUMKIN IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO DISMISS OR STAY THE ACTION**

I, William D. Frumkin, an attorney admitted to practice before this Court, declare, pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and correct:

1.    I am an attorney duly admitted to practice law in the State of New York and before this Court. I am a partner in the law firm Frumkin & Hunter, LLP, attorneys for Plaintiff Martin A. Badinelli.

2.    I submit this Declaration in Opposition to Defendant's Motion to Compel Arbitration and to Dismiss or Stay the Action.

3.    I know the facts testified to in this Declaration to be true based upon my own personal knowledge and a review of the documents in the files maintained by my office.

4.    Due to the fact that the Employment and Confidentiality Agreement ("Agreement") executed by the Plaintiff did not provide for any procedures that pertain to the manner in which the arbitration would be conducted, on May 7, 2015, I wrote a letter to opposing counsel on behalf of Plaintiff. A copy of this letter is annexed hereto as Exhibit 1.

5.    I proposed these provisions because I believed that they would enable the parties to enter into arbitration fairly.

6.    Defendant would not agree to the terms that concern how the costs for arbitration would be allocated. Instead, Defendant wanted the costs to be shared equally.

7.    Since the Defendant insisted that the parties equally share the costs of the arbitration, and because the Agreement provides that the prevailing party pay such costs in their entirety, my firm researched the current arbitration costs being charged by two major providers of arbitration services, the American Arbitration Association ("AAA") and Judicial Arbitration and Mediation Services ("JAMS").

*Arbitration Fees*

8.    If the parties proceeded with arbitration through the AAA, according to the July 1, 2015 Administrative Fee Schedule, the filing fee under the Standard Fee Schedule would be at least $5,000.00 because the Plaintiff is owed in excess of $750,000.00 based on his breach of contract claim alone. Complt ¶ 2.

9.    Additionally, there is a final fee of $6,200.00.

10.   If Plaintiff were to pay the fees of the arbitrators, based on the resumes of various AAA arbitrators that Plaintiff's counsel has received in recent matters, arbitrators charge either hourly or daily, and the arbitrators' fees range from $250.00 to $750.00 per hour and $1,400.00 to $3,750.00 per day.

11.   Based on my experience, and the fact that there are three claims in this case, the arbitration will last approximately three to five days.

12.   If the parties proceeded with arbitration through JAMS, the filing fee under the Standard Fee Schedule would be $1,200.00.

13.     JAMS' arbitrators' charge either hourly or daily, and such arbitrators' fees range

from $500.00 to $900.00 per hour and $10,000.00 to $15,000.00 per day.

14.     JAMS also charges a case management fee, which is 12% of all professional fees.

15.     Based on the above, the lowest possible arbitration fees for AAA or JAMS would be

$14,640 and the highest would be $89,900.00.

Dated: White Plains, New York
      November 20, 2015

                                          William D. Frumkin, Esq.

WILLIAM D. FRUMKIN
ELIZABETH E. HUNTER

ALEXANDRA C. MANFREDI

PARALEGAL
JANET M. HOWELL

OF COUNSEL
BROACH & STULBERG, LLP

# F H  FRUMKIN & HUNTER LLP

WRITER'S EMAIL: wfrumkin@frumkinhunter.com

May 7, 2015

*__Via Email and First Class Mail__*
*ppanken@ebglaw.com*
Peter Pankin, Esq.
Epstein Becker Green
250 Park Avenue
New York, New York 10177

Re:    *Martin A. Badinelli v. The Tuxedo Club*
       *Our File No. 15-8626*

Dear Peter:

As a follow-up to my email to you yesterday, it is my client's intention to enforce the terms of the Employment and Confidentiality Agreement by and between the Tuxedo Club, a New York Not-for-Profit Corporation and Martin A. Badinelli ("The Agreement") executed by the parties, a copy of which is attached for your convenience.

As we discussed previously, we do not believe that Section 10 of the Agreement, entitled Arbitration of Disputes, provides my client with the rights and remedies recognized by courts throughout the country that have addressed motions to compel arbitration in the employment context. In addition to the absence of a specific procedure as to how the arbitration will be conducted (e.g., the selection of the arbitrator, procedures relevant to conducting the arbitration, and payment of the costs involved), the Agreement states, "The Dispute resolution provision of the Agreement shall govern any arbitration under this Agreement, and such provisions are incorporated herein by the reference." However, there is no "Dispute resolution provision" set forth in the Agreement. Therefore, we believe this arbitration clause as written is not enforceable.

I have also attached provisions from an arbitration program used by another employer that in my view does comply with the law. Rather than proceeding in court and engaging in motion practice with respect to the proper forum where this dispute should be heard, please provide a detailed analysis of how your client wishes to conduct such arbitration so that we can make an informed assessment concerning whether such procedure protects my client's rights in accordance with the relevant case law. Since my client wants to move forward expeditiously to enforce the Agreement, please provide this information to me no later than May 15, 2015. If this information is not provided by then or we do not believe it complies with the relevant case law, we will file an action in an appropriate court of competent jurisdiction. Thank you for your anticipated cooperation.

Main Office:           1025 Westchester Avenue, Suite 309, White Plains, NY 10604 • T: (914) 468-6096 • F: (914) 468-6099
Orange County Office:  154 Main Street, Goshen, NY 10924 • T: (845) 294-7620 • F: (845) 294-3075
Of Counsel:            One Penn Plaza, Suite 2016, New York, NY 10119 • T: (212) 268-1000 • F: (212) 947-6010

01

Peter Pankin, Esq.                    -2-                        May 7, 2015

Very truly yours,

William D. Frumkin

WDF: jh

cc: Mr. Martin Badinelli

F:\APPLICAT\WP\Badinelli\L-Panken 5 7 15.wpd

# EMPLOYMENT
# AND
# CONFIDENTIALITY AGREEMENT

## By and Between

## The Tuxedo Club
## A New York Not-for-Profit Corporation

## And

## Martin A. Badinelli

# EMPLOYMENT AND CONFIDENTIALITY AGREEMENT

**THIS AGREEMENT ("AGREEMENT"),** made as of the first day of May 2013 (the "EFFECTIVE DATE") by and between The Tuxedo Club, a New York Not-for-Profit Corporation (the **"Company"**), and Martin A. Badinelli (the **"Employee"**).

## RECITALS

A.  **WHEREAS,** the Company desires to employ Employee, and Employee desires to serve, as the General Manager of the Company on the terms, conditions, promises, covenants, and agreements contained in this Agreement; and

B.  **WHEREAS,** Employee in order to fulfill his duties and obligations as General Manager of the Company, Employee must have continuing access to proprietary information, market strategies, member lists, and member relationships of the Company; and

C.  **WHEREAS,** Employee acknowledges and agrees that the Company have legitimate business reasons for protecting its proprietary information, trade secrets, market strategies, customer lists, and customer relationships; and

NOW, THEREFORE IN CONSIDERATION of the foregoing premises, and the mutual covenants contained in this Agreement and for other good and valuable consideration, including, but not limited to, the continued employment of Employee by Company, the parties, intending to be legally bound, agree as follows:

## AGREEMENT

1.  **Effectiveness of Recitals.**  The Recitals set forth above are an integral part of this Agreement and shall have the same contractual and legal significance as any other language in this Agreement.

2.  **Definitions.**  As used in this Agreement, the following capitalized terms shall have the following meanings.  Other capitalized terms are defined in the Recital above, and elsewhere in this Agreement.

    a.  *"Protected Area"* shall mean the territory in which the Company conducts business during Employee's employment.

    b.  *"Competitive Business"* shall mean any business which is engaged in the social club, including golf, dining, rackets, boating and other services offered by the Company in the Protected area at the time of Employee's termination of employment with the Company, and whose market area for such business overlaps the Protected Area. "Competitive Business" shall also include such other products and services as may in the future be offered by the Company, provided Employee has substantial involvement with such future products or services and has acquired Proprietary Information concerning such future products or services.

# EMPLOYMENT                              AND
## CONFIDENTIALITY AGREEMENT

---

c.  *"Proprietary Information"* shall mean any and all ideas, information and materials, tangible or intangible, not generally known to the public, relating in any manner to the business of the Company, products and services (including its officers, directors, employees and contractors), members, vendors and suppliers and all other with whom the Company does business that the Employee learns or acquires during Employee's employment with the Company.   Proprietary Information of the Company, source code, users manuals, algorithms, compilations of technical, financial, legal or other data, salary information, customer or prospective customer lists, names of suppliers or vendors, client, supplier or vendor contact information, business referral sources, specifications, designs, devices, inventions, processes, business or marketing plans or strategies, pricing information, media rate information, rate structures, information regarding the identity of the Company's directors, identity data, prototypes, forecasts, financial information, works in progress, and any other technical or business information.

d.  "Tangible Form" shall mean any and all ideas, information or materials in written or graphic form, on a computer disc or other medium, or otherwise stored in or available through electronic, magnetic, videotape or other form.

3.  <u>Term of Employment; Performance; Duties; Indemnification</u>:  The Company shall employ Employee as General Manager of the Company on a full-time basis with a customary Tuesday through Saturday workweek schedule, reporting directly to The Chairman of The Board of Governors to serve the Company for a period commencing on the 1st Day of May, 2013 and continuing for two (2) years until April 30, 2015. The Employee's term of employment under this Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term") shall be for a term commencing on the 1st Day of May, 2013 and, unless terminated earlier as provided in Section 6 hereof, ending on April 30, 2015 (the "Original Employment Term"), provided that the Employment Term shall be automatically extended for successive additional two (2) year periods (the "Additional Terms"), unless, at least six (6) months prior to the end of the Original Employment Term or the then Additional Term, the Company has notified the Employee in writing that the Employment Term shall terminate at the end of the then current term.

It is understood by the parties that the services to be rendered by Employee will be the duties generally performed by the General Manager of country clubs. Without limiting the generality of the above, the Employee shall perform his duties with respect to the management of the Company in accordance with industry standards for such a position and in doing so shall endeavor to meet or exceed the performance criteria as set forth by the Chairman of the Board of Governors and, as such, the Employee will report to, and be subject to the general direction and advice of, the Chairman of the Board of Governors of the Company. During the Employment Term, Employee agrees to devote his full time attention and energy to the business and affairs of the Company and to perform his duties  pursuant to the terms of this Agreement. It is understood that Employee may participate in charitable, religious, and civic activities

# EMPLOYMENT                           AND
## CONFIDENTIALITY AGREEMENT

provided that such activities do not materially diminish his performance as General Manager of the Company.  Employee covenants that at all times during Employment Term; he will maintain the fiduciary duties of loyalty and care in rendering the services called for by this Agreement.

The Company shall, during Employee's employment and thereafter, on the same basis as is provided for the Company's continuing officers and directors from time to time, indemnify and hold Employee harmless against any costs or expenses (including attorneys' fees), judgments, fines, losses, claims, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, by reason of the fact that the Employee was an employee or agent of the Company or any Subsidiary, whether asserted or claimed prior to, at or after the date of termination of employment, to the fullest extent permitted under applicable law and on a basis no less favorable than in existence under the Company's Bylaws and Certificate of Incorporation in effect as of the Effective Date. During Employee's employment and thereafter, the Company shall provide to Employee coverage under a policy of directors' and officers' liability insurance that provides Employee with coverage on the same basis as is provided for the Company's continuing officers and directors from time to time.

4.  **Compensation During Employment Term.**  As compensation in full for his services as General Manager of the Company, the Company shall pay Employee a Base Salary payable in accordance with the normal payroll procedures of the Company as they may change from time to time, less applicable payroll deductions, in accordance with the attached Schedule A.  Employee shall be eligible to receive a bonus of up to 20% of his Base Salary per year (the "Bonus Opportunity") based on his achievement of the Company under the terms of a program denominated the Management Incentive Program ("MIP"), which is set forth at Schedule B hereto.  The setting of Bonus Opportunity targets are the calculation and administration of the Bonus Opportunity payments, if any, shall be done in a manner consistent with the Company's normal practices, as they may change from time to time.  No commitments or guarantees have been made relative to the Bonus Opportunity bonuses, or any other special provisions, except as specifically provided for in this Agreement.

Employee understands and agrees that the Base Salary, the Bonus Opportunity, the Auto Allowance,  the Cell Phone Allowance, the Uniform/Clothing Allowance and the Comparative Dining Expense Allowance (each defined below) set forth in this Agreement shall be the sole sources of compensation which Employee is entitled to receive in connection with his services as General Manager of the Company, and that Employee shall not be entitled to any compensation excess of the Base Salary, Bonus Opportunity, the Auto Allowance, the Cell Phone Allowance, the Uniform/Clothing Allowance and the Comparative Dining Allowance unless a duly authorized subsequent written instrument, signed by the Chairman of the Company and the Employee, provides otherwise.  Employee understands that his position is classified as Exempt and is not entitled to overtime compensation under the Fair Labor Standards Act for any overtime hours that Employee, at his sole option, may work. In the event that any such excess compensation is paid to Employee, the payment of any such excess compensation shall not be deemed to be an amendment to this Agreement, and may be discontinued at any time without cause or reason.

During the Employment Term, Employee shall receive:

# EMPLOYMENT                                   AND
## CONFIDENTIALITY AGREEMENT

A.  Three (3) weeks annual vacation. Unused paid vacation time shall carry forward into the next year and will accrue until such time as the date of the termination of employment, at which time vacation will be paid at the then current salary.  For purposes of this agreement, vacation time eligibility shall accrue at the rate of one day of paid vacation for each seventeen (17) days from the beginning of employment until the date of termination, less used or paid vacation.

B.  Life, Medical and Dental Benefits consistent with the existing Company policies. Notwithstanding the foregoing:  a) These benefits, for Employee (and Family) coverage shall never fall below the level of benefits available to employee on the effective date of this agreement ;  b) the percentage of Employee's Benefit premium contribution shall never increase above the level (25%) in effect on the date of this agreement;

C.  Competitive 401(k) with a 50% match up to 8% of base salary and subject to IRS limitations.

D.  Reimbursement for documented business expenses related to the Company business consistent with policies of the Company.

E.  CMAA National and local Chapters' Dues.  Continuing Education expenses up to $1,500 per annum.

F.  Travel and related expenses to the Annual CMAA Conference.

G.  An Auto Allowance of a monthly amount (no additional payments for fuel, mileage or insurance) of Eight Hundred Dollars ($800.)

H.  Reimbursement of documented Uniform/Clothing /Dry cleaning expenses of up to Two Thousand Four Hundred Dollars ($2400.) per year.

I.  Cell Phone Allowance of a monthly amount of One Hundred Twenty-Five Dollars ($125.)

J.  Reimbursement of dining comparison expenses of up to Five Thousand Dollars ($5,000.). Dining expenses associated with attendance at CMAA conference or club business meetings are covered expenses under paragraph 4 (D) and (F) above.

K.   Such other benefits as are made generally available to other employees of the Company.

5.  <u>Inability to Perform</u>.  In the event that during the Employment Term, Employee is substantially unable to perform his duties, by reason of illness or any other incapacity or disability for a period of three (3) consecutive months, then the Company by serving thirty (30) days' prior

# EMPLOYMENT                                         AND
## CONFIDENTIALITY AGREEMENT

written notice on Employee, shall have the right, exercisable at its option, to terminate its obligations to Employee at any time after the end of such 3-month period. The exercise of such rights by the Company shall not affect Employee's entitlement to short or long term disability from any state or third party insurance provider, if otherwise payable.

6. **Termination of Employee.** Notwithstanding any other provision of this Agreement, the Company may terminate this Agreement (and terminate thereby, any future payment obligations to Employee) for "Cause", which shall mean any of the following reasons:

    A.  Employee's refusal to perform the duties as stated in this Agreement;

    B.  Employee's death;

    C.  Employee's inability to perform his duties due to illness, incapacity or disability as provided in paragraph 5 above;

    D.  Material violation of the Company's written policies, procedures, or regulations as in effect on the date of this Agreement;

    E.  Employee's material breach of any provision of this Agreement;

    F.  Following an investigation by the Club's Auditors that Employee committed an act of embezzlement, theft, fraud, or any other unlawful act that relates to the performance of Employee's duties or his obligations to the Company; or

    G.  Employee's conviction of a felony.

The Company may not terminate Employee for Cause under paragraph 6(A), (D), and (E) above until it first provides written notice to Employee of the specific grounds for termination for Cause, and until the passing of a fifteen (15) day period for Employee to respond to the notice and to cure any alleged violations or deficiencies, if curable. The termination would be effective at the end of the 15-day period. The Company may terminate Employee immediately for Cause under paragraph 6 (B), (F), and (G) above. In the event the Company terminates Employee under the provisions of paragraph 6(C) above, the Company will follow the procedures set forth in paragraph 5 above.

In the event that Employee is terminated without Cause, or if Employee resigns for Just Cause (as defined below), the parties agree the Company's responsibility and obligation shall be to continue to make, or cause to be made, regular payments to Employee of his Base Salary for the balance of the Employment Term or, at the sole and exclusive option of the Company, to make a lump sum payment to Employee of his remaining Base Salary, discounted to present value in accordance with published discount tables applicable at the time of termination. In addition, the Company shall continue to make, or cause to be made, other payments and benefits which are due Employee under paragraph 4 (A), (B), (C), (D), (E), (F), (G), (H), (I) and (K) above for the balance of the Employment term.

# EMPLOYMENT                                        AND
## CONFIDENTIALITY AGREEMENT

Employee shall have "Just Cause" for resigning in the event that (a) there is a material diminution in his title and job responsibilities, or (b) the Employee alleges that the Company committed a material breach of this Agreement, and such alleged breach remains uncured following written notice to the Company of any such alleged breach and following the passage of a reasonable period of time, of no less than fifteen (15) days, during which the Company may cure any such alleged breach, if curable.

Employee may also terminate this Agreement for any other reason by giving the Company at least twenty-eight (28) days prior written notice. Upon termination by Employee, Employee shall be entitled to all salary and payment for earned and untaken vacation pay earned to the date of termination. The date of termination or resignation for these purposes shall be the effective date of termination contained in the Employee's written notice, not the earlier date on which the notice of intent to resign was given. In addition, should Employee resign after Company has notified employee in writing that the Agreement will not be extended, Employee will be paid a minimum of 75% of the then current year's Bonus Opportunity.

Should the Company notify the Employee in writing, as required under paragraph (3), that the Agreement will not be extended and the Employee remains employed with Company until the end of the Employment Term, Employee will receive payment for earned and untaken vacation, plus a minimum of 75% of the then current year's Bonus Opportunity and a severance payment equal to two weeks of salary for each year, or part thereof, of employment, retroactive to April 13th, 2009, to the end of the Employment Term, up to a maximum of six (6) months of the then current salary. These payments, as well as all compensation and benefits under paragraph (4) will be made, or continue to be made, should Company notify Employee in writing, as required under paragraph (3), that the Agreement will not be extended but also notifies Employee that he need not return to the Club after such date of notice or another future date that pre-dates the end of the Employment Term.

Should the Employee be terminated without Cause or if he resigns for "Just Cause" or if he is notified that the Agreement will not be extended but the Company no longer desires his presence at the Company's regular place of business, Employee is permitted to engage employment elsewhere. Such other employment will not relieve the Company from its responsibilities and obligations as set forth in this Agreement.

Should the Employee resign for any reason, Employee may not directly solicit any other member of the Company's senior staff for employment with him elsewhere for a period of twelve (12) months following date of termination.

7.  **Confidentiality**.  Employee understands that, by virtue of Employee's employment with the Company, Employee will acquire and be exposed to Proprietary Information of the Company. Employee agrees to hold in trust and confidence all Proprietary Information during and after the Employment Term. Employee shall not disclose any Proprietary Information to anyone outside the Company without the written approval of an authorized officer of the Company or use Proprietary Information for any purpose other than for the benefit of the Company as required by Employee's authorized duties for the Company. In the event that Employee is requested to

# EMPLOYMENT                                    AND
## CONFIDENTIALITY AGREEMENT

disclose Proprietary Information under subpoena, court order or other legal process, Employee shall first provide written notice to the Company and allow the Company to petition the legal authority for a protective order.  At all times during Employee's employment with the Company, Employee shall comply with all of the Company's policies or regulations relating to the protection and confidentiality of Proprietary Information.  Upon termination of Employee's employment with the Company,

    A.   Employee shall not use Proprietary Information, or disclose Proprietary Information to anyone, for any purpose, unless expressly requested to do so in writing by an authorized Governor of the Company.

    B.   Employee shall not retain or take with Employee any Proprietary Information in a Tangible Form

The obligations of this paragraph 7 shall not apply, however to any information which:

    a.   Is already in the public domain or becomes available to the public through no breach of this Agreement by Employee;

    b.   Was lawfully in the Employee's possession prior to receipt from the disclosing party; or

    c.   Is received by Employee independently from a third party free to lawfully disclose such information to Employee.

8.   **Return of Documents and Materials.**  Immediately upon the termination of Employee's employment or at any time prior thereto if requested by the Company, Employee shall return all records, documents, equipment, proposals, notes, lists, files and any and all materials, including by not limited to Proprietary Information in Tangible Form, that refers to, relates or otherwise pertains to the Company and its business, including its products, services, personnel, members or clients (actual or potential), investors (actual or potential), and/or vendors and suppliers (actual or potential), or any of them and any and all business dealings with said persons and entities (the "Returned Property and Equipment") to the Company at their principal business address.  Employee is not authorized to retain any copies or duplicates of the Returned Property and Equipment that Employee obtained or received as a result of Employee's employment or other relationships with the Companies.

9.   **Rights and Remedies Upon Breach; Attorney's Fees:**  If Employee breaches any of the provisions of this Agreement, Employee agrees that the Company shall have the right and remedy to have each and every one of the covenants in this Agreement specifically enforced and the right and remedy to obtain temporary and permanent relief.  Moreover, if Employee breaches this Agreement during Employee's employment with the Company, Employees may be subject to the immediate termination of Employee's employment.

# EMPLOYMENT                                         AND
## CONFIDENTIALITY AGREEMENT

In any action or arbitration seeking to enforce this Agreement, the prevailing party shall be entitled to recover all reasonable attorney's fees, costs and expenses, including any expert fees, that were incurred by that party in connection with any such action or arbitration.

10. **Arbitration of Disputes**. The Company and Employee agree that if any disputes arise between them, except for the exceptions stated below, the disputes will be submitted exclusively to mandatory and binding arbitration. This means that disputes will be decided by an arbitrator, rather than a court and jury, and that Employer and Employee hereby waive their rights to a court or jury trial. The Dispute resolution provision of the Agreement shall govern any arbitration under this Agreement, and such provisions are incorporated herein by the reference.

    All disputes between the Company and Employee are covered by this paragraph 10, including claims of wrongful termination, discrimination, harassment, and any injury to Employee's physical, mental or economic interests. All disputes are covered by this paragraph 10, whether based on claim violations or statutory, contractual, common law rights or otherwise.

    The only disputes between the Company and Employee not covered by this paragraph 10 are claims for unemployment insurance on workers' compensation claims under the National Labor Relations Act, and disputes giving rise to the Company's rights and remedies pursuant to paragraph 9 above.

11. **Governing Law**. This Agreement shall be construed, interpreted, and governed in accordance with the laws of the State of New York regardless of applicable conflicts of law principles.

12. **Entire Agreement; Modification; No Waiver**. This Agreement represents the entire agreement of the parties with respect to the subject matter hereof and shall supersede any and all prior or contemporaneous oral or written agreements, arrangements, understandings, or contract between the parties hereto with respect to the subject matter hereof. This Agreement may not be modified or amended except by an instrument in writing signed by Employee and by a duly authorized officer of the Company. No waiver, delay, omission or forbearance in exercising any right, option, duty or power under this Agreement shall affect or impair any party's rights with respect to any past or present default or breach of any of the provisions of this Agreement.

13. **Parties in Interest; Assignment; Survival**. Neither this Agreement nor any of the rights, interests, duties, or obligations under this Agreement shall be assigned in whole or in part, by operation of law or otherwise, by Employee. Employee's duties and obligations under this Agreement shall survive the termination of Employee's employment by Employee of the Company.

14. **Voluntary Agreement**. Employee hereby acknowledges and represents that: (a) he has fully and carefully read this Agreement prior to signing it, (b) he has been, or has had the opportunity to have been, advised by independent legal counsel of Employee's own choice, and at his own cost, as to the legal effect and meaning of each of the terms and conditions, covenants, promises, restrictions, agreements, duties and obligations of this Agreement, and (c) he is

---

# EMPLOYMENT                                              AND
## CONFIDENTIALITY AGREEMENT

signing and entering into this Agreement as a free and voluntary act without duress or undue pressure or influence of any kind or nature whatsoever and has not relied on any promises, representations or warranties regarding the subject matter hereof other than as set forth in this Agreement.

15. **Notices.** All notices and other communications under this Agreement shall be in writing and must be given by postage prepaid, registered or certified mail as follows:

      A.   If to the Company:
            The Tuxedo Club
            West Lake Road
            Tuxedo Park, NY 10987
            Attn: Chairman

      B.   If to the Employee:
            Martin A. Badinelli
            P.O. Box 766
            40 Old Bridge Road
            Brookfield, CT 06804

**SIGNATURES ON FOLLOWING PAGE**

# EMPLOYMENT                             AND
## CONFIDENTIALITY AGREEMENT

**SIGNATURE PAGE**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

THE TUXEDO CLUB                              EMPLOYEE:

By _____                      _____
**Brian Sichol**                             Martin A. Badinelli
**Chairman**
**Board of Governors**

# EMPLOYMENT                                                 AND
## CONFIDENTIALITY AGREEMENT

## SCHEDULE A

### Tuxedo Club
### General Manager

### BASE COMPENSATION

| | |
|---|---|
| May 1, 2013 through April 30, 2014 | $195,000.00 |
| May 1, 2014 through April 30, 2015 | $207,500.00 |

**If Agreement is extended:**

| | |
|---|---|
| May 1, 2015 through April 30, 2016 | $220,000.00 |
| May 1, 2016 through April 30, 2017 | $232,500.00 |

14

EMPLOYMENT                                        AND
          CONFIDENTIALITY AGREEMENT

## SCHEDULE B

## Tuxedo Club
## General Manager
## Management Incentive Program

**Purpose**
The Management Incentive Program (MIP) is a variable incentive program intended to encourage and reward superior performance by providing a cash incentive when Company objectives are met or exceeded.

**Effective**
Each fiscal year ending April 30 will constitute an incentive award period. Awards will be calculated and paid after the close of the fiscal year. All payments represent taxable income. Applicable taxes will be withheld in accordance with State and Federal requirements for bonus payment. Award payments will be made as soon as possible after plan approval, normally within 30 days after the year end.

**Procedure**

| FACTOR | WT | DESCRIPTION |
|---|---|---|
| Profit | 50% | Bonus will be paid based upon audited annual financial statements reflecting the annual results of the "Operating Fund" which are equal to or better to the annual club budget (approved by the Board of Governors) for the fiscal years under this agreement. The Operating Fund shall include all operating costs including depreciation. |
| | | NOTE: 80 % of this bonus shall be deemed earned if the financial results are within 85% of the then year-end results of the Operating Fund. |
| | | Example A:  FY 20XX year budgeted net income/loss is ($300,000) loss.  FY 20XX actual net income/loss is ($330,000) loss. This results in 80% of weighted bonus being paid. Initiation Fees, bonds or capital changes are not included as revenue in Operating Budget. |
| | | Example B:  FY 20XX year budgeted net income/loss is ($300,000) loss.  FY 20XX actual net income/loss is ($350,000) loss. This results in 00% of weighted bonus being paid. Initiation Fees, bonds or capital changes are not included as revenue in Operating Budget. |

Badinelli, Martin                                                    Page 13

15

EMPLOYMENT                                              AND
CONFIDENTIALITY AGREEMENT

| Outside Party Revenue | 25% | Total Outside Party Revenue must be equal to or greater than total Outside Party Revenue budget for the fiscal years under this agreement as approved by the Board of Governors. |
|---|---|---|
| Discretionary | 25% - 35% | Subject to Executive Committee evaluation of other factors including but not limited to:<br>i.) Organizational Assessment<br>ii.) Budget Preparation and Implementation<br>iii.) Winter Operating Plan and Offerings<br>iv.) Food and Beverage Plan<br>v.) Outside Party Plan<br>vi.) Quality of Service<br>vii.) Member Satisfaction |

<u>Selection and Rules</u>: Except as specified below, you agree that any arbitration of a claim will be resolved by final and binding arbitration conducted under the auspices of the American Arbitration Association ("AAA") and its Commercial Arbitration Rules ("AAA Commercial Arbitration Rules"), or any successor rules, and shall be conducted before a single arbitrator unless all parties to the arbitration agree otherwise in writing. The arbitrator is required to issue a written award and opinion, and the award shall be final and binding, and any judgment or award issued by the arbitrator may be entered in any court of competent jurisdiction. The arbitration shall be subject to the same burdens of proof and statutes of limitations as if the claim was being heard in federal district court, and the parties may file and the arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. No arbitration award or decision will have any preclusive effect as to any issues or claims in any dispute, arbitration, or court proceeding where any party was not a named party in the arbitration.

<u>Remedies</u>: Subject to the parties' right to appeal or seek vacatur under applicable law, the arbitrator will be final and binding on the parties and that the arbitrator is authorized to award any party the full remedies that would be available to such party if the claim had been filed in a court of competent jurisdiction, including actual and reasonable attorneys' fees and costs, if any. The parties acknowledge and agree that as part of a party's costs, it may recover expert fees incurred to the same extent as it could in court. The parties acknowledge and agree that, subject to any applicable fee-shifting provisions, Employee shall be responsible for the filing fee required to institute arbitration with the AAA up to the amount of the filing fee you would have incurred had Employee filed such Covered Claim(s) in federal district court. The Employer shall be responsible for all additional arbitration filing fees, arbitrator fees, forum fees, and other fees and costs assessed by the AAA, subject to the arbitrator's exercise of its authority to award the Employer its costs and fees as the prevailing party or for other equitable reasons. Unless the arbitrator decides otherwise, Employee shall be responsible for its own attorneys' fees and costs.